Filed 9/26/16  Marriage of Minnis CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of BLAIR PAUL and ELIA QUIJADA MINNIS. | |
| | D070460 |
| BLAIR PAUL MINNIS, | |
| Appellant, | (Super. Ct. No. 13D009113) |
| v. | |
| ELIA QUIJADA MINNIS, | |
| Respondent. | |

APPEAL from an order of the Superior Court of Orange County, Mark S. Millard, Judge.  Affirmed.

The Law Offices of Saylin & Swisher, Brian G. Saylin, Lindsay L. Swisher, and Daniela A. Laakso for Appellant.

Law Office of Loida Tellez and Loida Tellez for Respondent.

In this marital dissolution action between Blair Paul Minnis and Elia Quijada Minnis, Blair appeals an order awarding Elia temporary child and spousal support.[1] Blair contends the order should be reversed because the trial court incorrectly determined his immediate prospective earnings and abused its discretion by refusing to consider Elia's cohabitation in determining her need for spousal support. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The parties were married in September 1997 and separated in December 2012. There was one child of the marriage—a daughter born in 1998. Blair filed a petition for dissolution in October 2013 and Elia filed a response to the petition. In October 2014, Elia filed a request for an order (RFO) awarding her child support, spousal support, and attorney fees. She requested spousal support of $10,000 per month and attorney fees of $20,000. Elia filed an income and expense declaration in October 2014 claiming zero income and total monthly expenses of $9,110.

Blair filed an income and expense declaration in December 2014 stating that he had been employed by City National Bank (City National) since May 1, 2014. Before his employment with City National, he was employed by Wells Fargo Bank (Wells Fargo). In 2014 he worked for Wells Fargo from the beginning of the year through April 19. In his declaration, Blair stated his income from wages or salary for the prior month (November 2014) was approximately $15,000; his average monthly wage or salary

_____

1     As is customary in family law cases, we will refer to the parties by their first names for convenience and clarity, intending no disrespect.

2

income was approximately $14,000;[2] and his average monthly income from commissions and bonuses was approximately $10,000. Blair claimed total monthly expenses of $13,640.45.

The court held the hearing on temporary support on December 22, 2014, and January 6, 2015. Blair testified that his monthly base salary was $14,000 ($168,000 annually) when he worked for Wells Fargo and increased to $15,000 when he began working for City National. Wells Fargo was his only employer in 2012 and 2013. Blair reported total income of $380,164 on his federal tax return for 2013, and $320,611 on his return for 2012.

In 2014, Wells Fargo paid Blair gross income of $167,933.41 between January 1, 2014, through April 19, 2014. His November 2014 paystub from City National showed that his "year to date" earnings from City National were $130,001.16, including a $25,000 signing bonus he received when he started his employment. Including his December base salary payment of $15,000, Blair's total income for 2014 was approximately $310,000. He did not expect to receive any bonuses from City National in 2015, but did expect to receive bonuses in 2016.

Blair testified that he ended his employment with Wells Fargo to work for City National because of stress. He explained that around the end of 2011 and the beginning of 2012, Wells Fargo was setting production goals "that were exorbitant, they were doubling constantly. The stress for production was overwhelming . . . ." Blair began to

---

2    On the first page of his declaration, Blair stated his monthly gross income from City National was $15,000.

experience anxiety attacks, and in May 2012, a coworker drove him to an emergency room, where he underwent testing for a stroke or heart problem. A few days later he told Elia that Wells Fargo was extremely stressful for him and he would be seeking employment elsewhere. It took him two years to find a new job because the job market in 2012 was flat. Additionally, it took time to find an institution that would recognize Blair and his business partner as a sole production unit.

Elia testified that her last employment was "a small project" between March and September of 2013, and her last employment before that job was in 2007. She quit work in 2007 to become a "stay-at-home mom" at Blair's request, and did not continue working after her project in September 2013 because she wanted to spend more time with her daughter who was suffering from anxiety and depression. Elia was trying to find employment as a gym trainer but she needed multiple certifications. The classes she needed to become a certified trainer would cost between $10,000 and $15,000, but she was getting some free training at her gym.

Elia testified that her boyfriend, Joaquin Martinez, owned the gym she went to three times a week. She denied she was also an owner of the gym but admitted business cards that identified her as an owner "were produced at one point as a gag gift". She did not participate in opening the gym but participated in closing the gym sometimes when she left with Joaquin. She did not receive any payment for work she did at the gym and Joaquin did not "do anything financially for [her.]"

Blair sought to prove that Elia and Joaquin lived together in the condominium that Blair and Elia owned. He called as witnesses three private investigators he had hired to

4

surveil Elia. Investigator David Gomez[3] entered Joaquin's gym on March 20, 2014, and saw Elia working behind the desk at the front counter. Joaquin was sitting by her. David asked Elia for a business card and she gave him a card that stated her name, number, location, and position. She told David she was the owner and would be happy to have him as a client. Joaquin said he was also an owner and Elia's client.

After the gym closed shortly after 9:00 p.m., David followed Elia and Joaquin back to Elia's residence. Elia drove her vehicle to the condominium and Joaquin was a passenger. After Elia parked the vehicle inside the garage and closed the garage door, David leaned a ketchup packet against the garage door so that he could determine the next morning whether the garage door had been opened during the night after it closed behind the vehicle. The next morning at 6:00 a.m., David observed that the ketchup packet was undisturbed. He later saw Elia and Joaquin leave the condominium together. He followed them to the gym and videotaped them as they opened the gym and "continued their day as workers there."

Later that day (March 21, 2014) Nestor Gomez relieved David at the gym. He observed Elia and Joaquin close the gym around 9:00 p.m. and later drive back to Elia's residence, enter the garage, and close the garage door behind Elia's vehicle. Nestor marked the garage door with a ketchup packet as David had done and observed the next morning that the packet was undisturbed. He later observed Elia and Joaquin drive

---

3    Because David Gomez has the same last name as private investigator Nestor Gomez, who also testified at the hearing, we will refer to David and Nestor by their first names, intending no disrespect.

together from the residence to the gym and open the gym. A third investigator, Miguel Valenzuela, observed Elia and Joaquin leave the gym together on the night of March 24, 2014, and arrive at Elia's residence in Elia's vehicle. He, too, placed a ketchup packet on the garage door and observed that it was undisturbed the next morning.

On March 25, 2014, David again observed Elia and Joaquin close the gym and drive together to Elia's residence and park in the garage. David again leaned a ketchup packet against the garage door. Nestor went to the residence at 7:00 a.m. the next morning and observed that the ketchup packet was undisturbed. Elia and Joaquin left the residence in Elia's vehicle and Nestor followed them to the gym. He observed them close the gym and return to Elia's residence around 9:00 p.m. After they went inside, he leaned a ketchup packet against the garage door.[4]

Similar surveillances in November 2014 involving ketchup packs placed on Elia's garage door indicated that Elia and Joaquin spent the nights of November 10 through 13 together in Elia's residence. Elia testified that Joaquin did not live with her; he lived with his father above the gym but occasionally spent the night at her place.

After hearing argument from counsel, the court ordered Blair to pay Elia child support of $388 per month and spousal support of $5,789 per month. The court based its award on Blair's testimony that his income in 2014 was $261,314, consisting of $120,000 in base salary from City National; the $25,000 signing bonus from City National; $48,000 in base salary from Wells Fargo for the first four months of 2014, and the

---

[4] Nestor was not asked about the fate of that ketchup pack.

6

$68,314 in bonuses from Wells Fargo that he received in April 2014. The court explained, "So when you add it all together, you get [$]261,314 for the year, and that's what I choose to use as his income." The court noted that Blair's "gross income . . . was greater in years past . . . ."

The court acknowledged the possibility that Blair might not earn any bonus income in the next few months, stating: "I will grant you that if we average [Blair's] situation to . . . this April . . . , then in May he may be entitled to a reduction if he doesn't earn any bonus between now and May. And at that point I certainly would put him on a *Smith/Ostler*,[5] and I will tell you what it is. But in any event, I think using that figure is appropriate. It's the last full year of employment, with the understanding that in the future his income may be less on a monthly basis but with the realization that he's entitled to bonuses. His contract says he is. Whether he earns them or he doesn't earn them, we're speculating at this point, so I'll use a percentage in the future, after April, okay, to the extent that this is above what I found his income to be."

---

5      The court was referring to the type of order approved in *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33 (*Ostler & Smith*), in which the husband, who paid child and spousal support, earned bonus income in addition to a base salary. Noting that " '[n]o future bonus is guaranteed[,]' " (*id.*, at p. 41) and that " '[i]t would therefore not be appropriate to base a support order on Husband's bonus income and then require him to file motions to modify at such times as the bonus is reduced[,]' " (*ibid.*), the trial court in *Smith & Ostler* decided " '[i]t would be more fair to all parties to base the support order on Husband's income from salary and dividends, and to allocate a portion of the future bonus income to the children and to Wife by way of a percentage interest so that future litigation will not be necessary as the bonus income changes.' " (*Id.* at pp. 41-42.) Accordingly, the *Smith & Ostler* trial court ordered the husband to pay $3,000 per month in permanent spousal support, plus 15 percent of his annual gross cash bonus when the bonus was received. (*Id.* at p. 42.)

Regarding Elia's income, the court stated that "[w]hile she says she doesn't work, she spends some significant time at this gym. . . . [S]he's there, and she looks and acts like she's working from anything I heard. [¶] Now, I don't know what a non-trainer makes per hour, but it's obvious to me she can certainly earn $10 an hour for her time. And she's going to be a trainer, and she's going to make a lot more than that in the near future if she gets her license or her certification as a trainer, but I'm reasonably going to charge her something for the five hours I think she could spend at that gym on a daily basis. The child is in school. You can spend five hours at this gym. That averages, at 10 bucks an hour, $1,083 a month, and that's what I'm going to charge her, because she's there enough."

Near the end of the hearing, the court clerk asked the court to clarify whether it was "going to do a *Smith/Ostler*" order. The court responded, "Well, I didn't look at the numbers on the *Smith/Ostler* really." The court then added: "The court is reserving on the *Smith/Ostler*. It will grant a *Smith/Ostler* [order]; however, I have to grant it on the basis of a base, and the base that I am looking for is $15,000 [per month] . . . . And I believe, when I looked, when I glanced at it, it was somewhere in the area on the spousal support side as 32 percent, but I'll have to look." The court set a hearing for March 26, 2015, "only for the purpose of giving you the exact amount of the *Ostler/Smith*. [¶] . . . [¶] The percentage."

On January 15, 2016, Blair filed a motion for new trial and a motion for reconsideration challenging the court's temporary support order. On both motions, Blair argued he presented substantial evidence that Elia was cohabiting with Joaquin and the

8

court erred by not applying Family Code[6] section 4323, which provides "there is a rebuttable presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a nonmarital partner."

Blair further argued "overwhelming evidence" supported a finding that Elia was living at a "far greater living standard" than Blair and their daughter. He cited the evidence that Elia was a certified trainer and general manager of the gym and claimed he had recently discovered evidence that certain government records showing Elia was a member of the LLC (limited liability company) that owned the gym had been "changed so as to delete her participation." Finally, Blair contended the court erred in using his income for the previous 12-month period as the basis for the support award because the evidence established that his immediate prospective earnings were limited to his $15,000 per month base salary from City National.

At a hearing on March 6, 2015, the court denied Blair's motion for new trial and continued his motion for reconsideration to May 22, 2015. Blair filed his notice of appeal on March 11, 2015.

## DISCUSSION

### I. *Appealability*

An order granting or denying temporary spousal or child support is appealable. (*In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 506 [temporary spousal support]); *County of Yolo v. Worrell* (1989) 208 Cal.App.3d 471, 474, fn. 6 [temporary

---

6 All subsequent statutory references are to the Family Code unless otherwise specified.

child support]).  However, Elia suggests the temporary support order in this case is not a final, appealable order because the court continued Blair's motion for reconsideration of the order and the record does not show the motion's resolution.

Blair's pending motion to reconsider the appealed support order did not affect the order's finality for purposes of appeal.  Code of Civil Procedure section 916, subdivision (a), provides that "[e]xcept as [otherwise] provided . . . , the perfecting of an appeal *stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby,* including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order."  (Italics added.)

In *Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35 (*Young*), the trial court granted the plaintiff's motion to reconsider an order granting the defendant's special motion to strike a cause of action in the plaintiff's complaint, and the defendant then filed its own motion to reconsider the order granting the plaintiff's prior motion for reconsideration.  (*Id.* at p. 40.)  While the defendant's motion for reconsideration was pending, the defendant filed a notice of appeal from the same order it was requesting the court to reconsider (i.e., the order granting the plaintiff's motion for reconsideration).  (*Ibid.*)  The trial court granted the defendant's motion for reconsideration, after which the defendant abandoned its appeal and the plaintiff appealed the order granting defendant's motion for reconsideration.  (*Id.* at p. 46.)

This court in *Young* held that the order granting the defendant's motion for reconsideration was ineffective and void because the defendant's filing a notice of appeal

10

from the same order it challenged in its motion for reconsideration deprived the trial court of jurisdiction to rule on the motion for reconsideration. (*Young*, *supra*, 210 Cal.App.4th at pp. 51-53.) The trial court in *Young* lacked jurisdiction to reconsider the appealed order *"because ' "[t]he trial court's power to enforce, vacate or modify an appealed judgment or order is suspended while the appeal is pending*." ' " (*Young*, at p. 51, italics added.)

Likewise, when Blair filed his notice of appeal from the temporary support order in this case, the trial court's power to vacate or modify the order was suspended under Code of Civil Procedure section 916, subdivision (a). In the words of the *Young* court, "the trial court lost subject matter jurisdiction over [Blair's] reconsideration motion . . . because the filing and perfecting of [Blair's] . . . own appeal caused the trial court to lose its authority to resolve [Blair's] . . . reconsideration motion, which was still pending when [the] appeal was filed." (*Young*, *supra*, 210 Cal.App.4th at pp. 41-42.) Blair's motion to reconsider the appealed support order did not affect the order's appealability.

II. *Amount of the Support Award*

A. <u>Determination of prospective earnings</u>

Blair contends the support order should be reversed because the time period the court used to calculate his income for purposes of support did not reflect his immediate prospective earnings.

Different rules govern awards of temporary and permanent support. Temporary spousal and child support is authorized by section 3600, which provides in relevant part

11

that "[d]uring the pendency of any proceeding for dissolution of marriage . . . the court may order (a) either spouse to pay any amount that is necessary for the support of the other spouse . . . or (b) either or both parents to pay any amount necessary for the support of the child, as the case may be."

We review spousal and child support awards under an abuse of discretion standard. (*In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327. (*Wittgrove*).) " 'We cannot substitute our judgment for that of the trial court, but only determine if any judge reasonably could have made such an order. [Citation.] Our review of factual findings is limited to a determination of whether there is any substantial evidence to support the trial court's conclusions.' " (*Ibid.*) "Generally, 'the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered.' " (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.)

"Generally, temporary spousal support may be ordered in 'any amount' based on the party's need and the other party's ability to pay. [Citations.] 'Whereas permanent spousal support "provide[s] financial assistance, if appropriate, as determined by the financial circumstances of the parties after their dissolution and the division of their community property," temporary spousal support "is utilized to maintain the living conditions and standards of the parties in as close to the status quo position as possible pending trial and the division of their assets and obligations." [Citations.]' [Citation.] The court is not restricted by any set of statutory guidelines in fixing a temporary spousal support amount. [Citation.]

12

"Rather, in exercising its broad discretion, the court may properly consider the 'big picture' concerning the parties' assets and income available for support in light of the marriage standard of living. [Citation.] Subject only to the general 'need' and 'the ability to pay,' the amount of a temporary spousal support award lies within the court's sound discretion, which will only be reversed on appeal on a showing of clear abuse of discretion. [Citation.] 'Ability to pay encompasses far more than the income of the spouse from whom temporary support is sought; investments and other assets may be used for . . . temporary spousal support . . . . [Citations.]' [Citation.] Trial courts may properly look to the parties' accustomed marital lifestyle as the main basis for a temporary support order." (*Wittgrove*, *supra*, 120 Cal.App.4th at p. 1327.)

We find no abuse of discretion in the court's calculation of Blair's income for purposes of support. Based on Blair's own testimony, the court reasonably could have found Blair's income for 2014 to be approximately $313,000, but instead found his income for that year was of $261,314, and used that substantially lower amount as the basis of its temporary support award.[7] The evidence showed that Blair's total income in

_____

[7]     During Blair's initial testimony at the temporary support hearing, he stated that he was paid a "gross total" of $167,933 in base salary and bonuses from Wells Fargo in 2014, and he testified that his monthly base salary from Wells Fargo was "$14,000 on average." Adding the $25,000 signing bonus plus the $120,000 he received in base salary from City National to the $167,933 he received from Wells Fargo results in total income of $312,933 for 2014.

Subtracting four months of Blair's $14,000 base salary paid by Wells Fargo or $56,000 from his total Wells Fargo earnings of $167,933 in 2014 would mean that Wells Fargo paid him $111,933 in bonuses in 2014. However, Blair later testified that Wells Fargo paid him a total of $68,314 in bonuses in 2014, and the court used that figure in calculating Blair's total income for 2014. The court also found that Wells Fargo paid

13

2013 was $380,164 and in 2012 was $320,611. The court explained that using $261,314 as Blair's annual income was appropriate "with the understanding that in the future his income may be less on a monthly basis but with the realization that he's entitled to bonuses. His contract says he is." The court then indicated it would issue a "*Smith/Ostler*" order in April—about three months after the January 6, 2015 hearing.

Thus, the court's support order took into account both Blair's potential to earn bonus income in his current employment with City National and the likelihood that his bonus income from City National would be less than it was from Wells Fargo during the coming year. The order was reasonable in light of Blair's testimony that the work he did at City National was similar to the work he did at Wells Fargo with similar potential to earn bonus income, and his base salary from City National was approximately $1,000 per month more than it was from Wells Fargo. Blair testified that he expected to earn bonus income from City National after 2015.

Blair relies on *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075 (*Riddle*) in arguing the trial court erred by using a time period to calculate his income that did not reflect his immediate prospective earnings. *Riddle* does not compel a different result regarding Blair's ability to pay temporary spousal support. The trial court in *Riddle* based an award of permanent spousal support and child support on a calculation of the husband's monthly income based solely on the preceding two-month period, during

Blair base salary in the total amount of $48,000 "for the first four months [of 2014]," instead of $56,000, presumably because during his resumed testimony at the January 6, 2015 hearing, Blair indicated his base salary from Wells Fargo for the first four months of 2014 "would have been more around the $12,000 figure, I believe."

14

which time the husband's earnings were substantially higher than his monthly average over the preceding year.  (*Id.* at pp. 1078-1079.)  The *Riddle* court decided the trial court had abused its discretion by calculating the husband's monthly income based on only a two-month period, stating, "It is a manifest abuse of discretion to take so small a sliver of time to figure income that the determination essentially becomes arbitrary. . . .  A mere *two months* is an embarrassingly short period on which to predict the annual income of a commissioned salesperson who works in the financial markets."  (*Id.* at p. 1083.)

In the present case, the trial court did not base its determination of Blair's monthly income and his ability to pay support on an "embarrassingly short period;" the court considered Blair's income over the entire year of 2014 and calculated support based on an annual income amount ($261,314) that was substantially lower than the amount he testified that he earned in 2014 (about $310,000) and his annual income in 2012 and 2013.  The trial court reasonably could assume Blair would continue to earn *some* bonus and commission income in his position with City National, as he had earned performing similar work with Wells Fargo.  The court did not assume, as Blair suggests, that Blair would continue to earn the *same* income he had earned with Wells Fargo.  Rather, the court conservatively calculated Blair's preset income for purposes of the temporary support award to be substantially less than it had been over the preceding three years. Unlike *Riddle*, in which the "Husband obtained a whopping large commission in February 2003, and the trial court predicated its order on the unrealistic theory that such commissions, clearly out of line with what he was making in just the previous 12 to 14 months, would continue indefinitely[,]" (*Riddle*, *supra*, 125 Cal.App.4th at p. 1084), the

15

trial court here predicated its temporary support order on projected monthly income that was *lower* than the monthly income Blair historically had earned.

Our conclusion that the court acted within its discretion in determining temporary support also rests on the fact that the temporary support order at issue covered only the first three months of 2015 because the court set a hearing in March 2015 for the express purpose of modifying the order by issuing an *Ostler & Smith* order—i.e., a support order that would be based on Blair's base salary of $15,000 per month plus a percentage of bonuses to be determined at the hearing. Considering the court's expressed intent to modify the temporary support order within a few months to more accurately reflect Blair's base salary plus a percentage of his bonus income, along with the court's decision to base the initial temporary support order on a substantially lower income figure than Blair's actual income had been for the preceding 12-month period, we cannot say the court exceeded the bounds of reason in awarding temporary support.

Finally, as we noted, "[t]rial courts may properly look to the parties' accustomed marital lifestyle as the *main* basis for a temporary support order." (*Wittgrove*, *supra*, 120 Cal.App.4th at p. 1327, italics added.) In the present case, the record reflects that the trial court based its support order on the parties' accustomed marital lifestyle as well as Blair's income. Responding to Blair's position that Elia had not shown need for spousal support, the court stated: "When you say that there's no basis for showing need, obviously if his [monthly] income is . . . [$]21,776, the fact that he lives in a nicer house than she does, . . . and [has] nicer accoutrements, [a] nicer car, whatever, is enough to

16

prove that their standard of living is such that she's entitled to at least benefit somewhat for that. This is, after all, a long-term marriage."

Although the court determined Blair's prospective income to be *lower* than it had been over the preceding few years, the court explained at the March 6, 2105 hearing : "I think I made it clear that these people lived a rather substantial lifestyle, that the purpose of temporary support is to maintain to the extent that you can the status quo pending the trial in the case. That's what I attempted to do, giving some liberal treatment to, frankly, [Blair's] income, and I didn't count every nickel for the reasons that I've already stated."

In sum, the temporary support order reflects a reasonable balance between the parties' accustomed marital lifestyle, which the court could properly consider as the *main* basis for temporary support, with the reality that Blair would likely earn less income in the coming months than he historically had earned. The court essentially accommodated what it could reasonably view as a temporary dip in Blair's income in two ways: (1) by substantially reducing his monthly income for purposes of support from what it had been over the preceding 12 months and (2) by setting a hearing in the near future to issue an *Ostler & Smith* order to account for fluctuations in Blair's bonus income. Considering the totality of the circumstances, we conclude that the court's determination of Blair's income for purposes of temporary support was reasonable and not an abuse of discretion.

B. Stress of prior employment

Blair contends that because he left his employment with Wells Fargo for health reasons, the trial court erred by including his income from Wells Fargo in determining temporary support. He cites *In re Marriage of Simpson* (1992) 4 Cal.4th 225 (*Simpson*)

17

for the proposition that the court may not base an income calculation on an unreasonable work regimen.

The California Supreme Court in *Simpson* held "an award of support following dissolution of a marriage generally should not penalize for his or her efforts a supporting spouse who voluntarily has undertaken an extraordinarily rigorous work regimen during the marriage, by locking that spouse into an excessively onerous work schedule." (*Simpson*, *supra*, 4 Cal.4th at p. 228.) A supporting spouse's "earning capacity generally should not be based upon an extraordinary work regimen, but instead upon an objectively reasonable work regimen as it would exist at the time the determination of support is made." (*Id.* at pp. 234-235.)

"A reasonable work regimen, as opposed to an extraordinary regimen, however, is not readily or precisely determined and is dependent upon all relevant circumstances, including the choice of jobs available within a particular occupation, working hours, and working conditions. Established employment norms, such as the standard 40-hour work week, are not controlling but are pertinent to this determination. In certain occupations a normal work week necessarily will require in excess of 40 hours or occasional overtime and thus perhaps an amount of time and effort which may be considered reasonable under the circumstances. A regimen requiring excessive hours or continuous, substantial overtime, however, generally should be considered extraordinary." (*Simpson*, *supra*, 4 Cal.4th at pp. 235-236, fn. omitted.)

The record does not show that the court based its calculation of Blair's future income with City National on an extraordinary or unreasonable work regimen. Blair

18

suggests that the temporary support order would require him to work at the same level of stress he experienced working for Wells Fargo. Even if that were true, it does not establish that the work Blair did at Wells Fargo involved an extraordinary regimen *for that industry and particular occupation*. Blair's testimony that he experienced anxiety attacks in 2012 because Wells Fargo set exorbitant production goals in late 2011 and the beginning of 2012, and that the stress of meeting those goals resulted in a visit to the emergency room in May of 2012, did not compel the court to find that his work regimen at Wells Fargo was extraordinary within the meaning of *Simpson*. Even if Blair's work regimen at Wells Fargo was extraordinary in 2012 when he went to the emergency room, his testimony about that emergency room visit did not compel a finding that he continued to engage in an extraordinary work regimen in 2013 or 2014 at Wells Fargo, or that he left Wells Fargo to work for City National in 2014 for health reasons, and there is no basis in the record to conclude that the court's temporary support award would require Blair to engage in an extraordinary work regimen at City National following the award.

The evidence that Blair's prior job with Wells Fargo and replacement job with City National involved similar work and income potential, along with the evidence that Blair succeeded in earning substantial bonus income at Wells Fargo and continued working there for two years after his visit to the emergency room, tends to show that his work regimen at Wells Fargo was not extraordinary within the meaning of *Simpson*. The *Simpson* court characterized an extraordinary work regimen as one "requiring excessive hours or continuous, substantial overtime . . . ." (*Simpson*, *supra*, 4 Cal.4th at p. 236.) There was no evidence that the stress Blair experienced working for Wells Fargo was

19

caused by having to continuously work unreasonably excessive hours. The evidence that over two and a half years before the hearing, Blair went to an emergency room for stress-related symptoms caused by his employment with Wells Fargo did not compel the court to ignore his past income from Wells Fargo in calculating his income for purposes of support. The court did not abuse its discretion in using *some* of Blair's bonus income from Wells Fargo in calculating his income for purposes of temporary support.

C. Elia's alleged cohabitation

Blair contends the court erred by not applying section 4323 to reduce Elia's spousal support based on her cohabitation with Joaquin. As noted, section 4323 (a)(1) provides that "there is a rebuttable presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a nonmarital partner." Blair argues the court erroneously decided section 4323 does not apply to temporary spousal support.

Although the trial court stated that it did not "think [section 4323] applies at this particular point, but certainly is something to consider along with all the other [section] 4320 factors when we get there[,]" we need not consider whether section 4323 applies to temporary support awards because the court impliedly found that Elia and Joaquin were not cohabiting within the meaning of section 4323. When the court issued its oral ruling at the support hearing, it stated, "The fact that she has a boyfriend, which she does, and [the fact that] you have a couple of proofs that the boyfriend has stayed overnight doesn't prove that he's really supporting her to any great degree, so I can't go that far . . . ." In stating that the evidence showed only that Joaquin had stayed overnight at Elia's

20

residence and did not prove he was supporting her, the court impliedly found that Elia and Joaquin were not cohabitating.

At the March 6, 2015 hearing when the court denied Blair's motion for new trial, the court confirmed its finding that Elia and Joaquin were not cohabiting. The court stated, "There were minimum number of days when [Joaquin] was living in the same apartment, or the condo, where [Elia] was living. She testified, and I believed her, yeah, he stayed overnight sometimes but, you know, they weren't cohabiting. He wasn't receiving his mail there. He wasn't paying anything of consequence to her. They went out to dinner on occasions, . . . she testified to that. And she denied that she was cohabiting with him, so I believe her. [¶] In any event, I didn't hear from [Joaquin], the man that she allegedly was cohabiting with, so I accepted her testimony. And so that's where I was on that issue."

The evidence sufficiently supported the court's finding that although Joaquin and Elia sometimes spent the night together at Elia's residence, they were not cohabiting. The court was entitled to find credible Elia's testimony that Joaquin did not live with her but rather lived with his father above the gym and occasionally spent the night at her residence. Accordingly, the court did not err in not applying the rebuttable presumption of decreased need for support based on cohabitation under section 4323.

21

DISPOSITION

The order is affirmed.

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

PRAGER, J.[*]

---

[*]    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22