Filed 9/7/16  Certified for Publication 10/3/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of LAURALIN ANDERSON COHEN and RICHARD COHEN. | |
| LAURALIN ANDERSON COHEN, Respondent, v. RICHARD COHEN, Appellant; ORANGE COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES, Intervener. | G052058 (Super. Ct. No. 06D009414) O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Nathan R. Scott, Judge.  Affirmed.

John R. Schilling for Appellant.

The Law Offices of Saylin & Swisher, Brian G. Saylin, Lindsay L. Swisher and Daniela A. Laakso for Respondent.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Linda M. Gonzalez and Jennevee H. de Guzman for Intervener.

\* \* \*

## I. INTRODUCTION

The marriage underlying this case was sadly overburdened and failed. Unfortunately, the divorce is also problematic. Essentially, a very high earner making $1.9 million during the marriage agreed to a stipulated divorce judgment providing for above-guideline child and spousal support. In this appeal from what was (mostly) the denial of the high earner's postjudgment request for a reduction of his child support obligations to guideline and his request to terminate spousal support in the wake of the wife's remarriage, he presents two issues of law.

(1) There was a clause in the stipulated judgment to the effect that any future modification proceeding would be reviewed de novo. Did that clause eliminate the usual change-of-circumstances rule that applies to postjudgment modifications? We answer no. The law does not allow litigants to agree to what are in effect "temporary" judgments, revisable at will.

(2) There was a clause in the stipulated judgment that said if the high earner's ex-wife remarried to a person making less than $400,000 a year, the high earner would still keep paying her spousal support – but at a reduced rate. Did the ex-wife's remarriage terminate spousal support *anyway*, given that the clause did not expressly mention Family Code section 4337,[1] the statute that makes spousal support terminable at remarriage? Again we answer no. The lack of an express reference to section 4337 did

---

[1] All further statutory references are to the Family Code.

2

not function as a kind of "king's X" to contradict the plain intent of the clause – particularly since the parties modified the stipulated judgment in October 2012 to provide for continued spousal support after the wife's imminent remarriage.

We thus conclude there is no error in the orders challenged here. The trial court correctly denied the high earner's requests to modify the child support amounts down to a guideline amount,[2] and also correctly denied his request to terminate spousal support in the wake of the ex-wife's subsequent remarriage.

## II. FACTS

Lauralin and Richard Cohen were married in 1990 and separated in 2006. They had four children. Lauralin[3] then petitioned for dissolution of the marriage. A little less than five years later, the couple entered into a stipulated judgment for dissolution.

Richard is a highly-paid executive in the clothing industry who had earned about $1.9 million a year during the marriage. But his income had gone down by 2011. The stipulated judgment recites that Richard's income in March 2011, was $70,166 per month, which works out to $841,992 annually.

The stipulated judgment provides for total monthly child support payments in excess of $17,366 a month.[4] In computing that amount, Richard is given credit for

---

[2]  The trial court did reduce support for a four-month period in 2014, a temporary reduction which the husband does not challenge in this appeal, and which we explain in more detail below.

[3]  We use first names for convenience.

[4]  The judgment does not spell out such a handy single number in one place. The trial judge, however, canvassed the various provisions of the judgment dealing with child support and put them into a helpful encapsulation in his minute order explaining his ruling:
"a. Jason, $2750 per month
"b. Dean, $1800 per month
"c. Skylar, $6650 per month
"d. Daniel, $2000 per month (into a trust)
"e. Plus $12,500 annually for each child (Daniel's into a trust)
"f. Plus 100% of the children's health care costs (though employer-provided funds and insurance)
"g. Plus 100% of the children's school tuition costs through high school."
According to Lauralin, the reason for some of the disparities in the payments to the children was to facilitate some publicly-assisted nursing care for two of the children, Daniel and Jason. That public assistance is the reason the Attorney General's office has filed a brief here on behalf of Orange County Department of Child Support Services.

3

having a 90 percent time share with one of the children, Dean, and a 10 percent time share with two of the other children, Jason and Skylar. The fourth child, Daniel, is quadriplegic as a result of cerebal palsy, and requires continual nursing care.[5] There is no dispute that the child support order is *higher* than statutory legal guidelines (see § 4055 et seq.) require.

The judgment also has a provision stating that any future requests to modify support should be reviewed "de novo by the court." The exact text of this provision is: "The allocations of support as set forth above are without prejudice to either party. In the event that either party seeks a modification of child support or dependant adult support in the future, said support amounts and the allocation of said support shall be reviewed de novo by the court."

It further provides for spousal support in the amount of about $19,166 a month.[6] The judgment had this provision in regard to remarriage by Lauralin: "In the event Petitioner [Lauralin] becomes remarried and Petitioner's new spouse income is less than $400,000.00, Respondent's [Richard's] total annual spousal support obligation shall be reduced by an amount equal to 45% of Petitioner's new spouse income. If [Lauralin's] new spouse income is greater than $400,000.00 per year, [Richard's] spousal support obligation shall be reduced to zero. This provision shall not apply if [Lauralin] remarries within 24 months of entry of this Judgment. In the event that [Lauralin] remarries within 24 months of entry of this Judgment, spousal support payable to [Lauralin] shall terminate."

In January 2014, Richard filed a request for order (RFO) seeking, among other things, a reduction in his child support obligation based on significant declines in

---

[5]      All four children face some sort of significant disability. According to Lauralin's declaration, in addition to Daniel, who has cerebral palsy, Jason is autistic and given to seizures, and Dean and Skylar (who are adopted siblings) each have ADHD; Dean also has reactive attachment disorder while his sister Skylar is bipolar.
          Daniel is now an adult but incapacitated under section 3910 and thus still receiving support.

[6]      $15,000 a month plus an annual payment of $50,000, which works out to the $19,166.66 figure on a monthly basis.

4

his income incurred in the years 2012 and 2013.  Clearly his income *had* declined in those two years.[7]  However, by the time Richard's request was finally heard on February 3, 2015, the parties had achieved a stipulation which took care of all issues prior to January 1, 2014.  Thus Richard's RFO was based only on his income in 2014  going forward.

And by February 2015, things had significantly turned around for Richard. In May 2014, Richard had begun working for a Hong Kong based company, Trinity Limited.  That month Trinity began paying him a salary of $500,000 a year ($41,666 a month).  *Plus*, it paid him a $500,000 signing bonus, predicated on meeting certain "targets" over the course of the next two years.

Three requests were presented to the court on Richard's motion:  (1) reduction of child support to guideline level, particularly in light of the de novo clause in the stipulated judgment; (2) termination of Lauralin's spousal support based on a remarriage that occurred in October 2012, and (3) an increase of Richard's time share percentage re Skylar to 100 percent based on his payment of 100 percent of the costs of Skylar's being in a school for mentally ill children.  Richard challenges the trial court's decision as to issues (1) and (2), which he lost except for a four-month reduction for the first four months of 2014.  Issue (3) has been abandoned on appeal.

In regard to issue (1), the child support reduction, the trial judge noted that, considering Richard's new employment with Trinity at $41,666 a month plus proration of his $500,000 bonus over the 24 months from May 2014 (another $20,833 a month), and an "ex pat" benefit paid by Trinity ($10,833 a month), Richard was now making *more* money than he was making at the time of the May 2011 judgment – *at least* $73,932

---

7        Just as the May 2011 judgment was being entered, Richard lost his job with Robert Talbott Inc., so his income for May and June of 2011 was zero.  From July 2011 to July 2012, he made $30,000 a month at Saks Fifth Avenue, and in 2012 about $44,000 a month from Saks, which continued to September 2013.  He lost his position at Saks that month, but soon found employment with the WDiamond Group at about $20,000 a month, which is where his income stood in January 2014.  But as we shall soon see, his employment fortunes were about to change for the better.

month against the earlier $70,166.[8] On the other hand, if one were to take into account the first four lean months of 2014 – in which Richard had made $27,830 per month – the total average for the year 2014 would be $62,695, which, if our math is correct, would represent a roughly 11 percent drop in income from the level provided for in the 2011 stipulated judgment.

The trial judge resolved these disparities by amortizing the two-year $500,000 bonus prospectively from May 2014 forward. In practical terms, that meant the court granted Richard's request to reduce child support for the first four months of 2014 (prior to the Trinity employment), but from May 2014 forward, there were no adverse changes of circumstance to justify modification.

As to issue (2), it turned out that Lauralin had remarried on October 19, 2012, which was just a little more than *18 months* since the date of the March 3, 2011 stipulated judgment. Had nothing been done, her 2012 remarriage, by the terms of the March 2011 judgment, would have terminated all spousal support.

However, on October 15, 2012, four days before her remarriage, she and Richard, each now in propria persona,[9] entered into a stipulation which retroactively changed the 24-month period that began on March 3, 2011, to an 18-month period. The net effect of the stipulation allowed Lauralin to remarry within the next few days and still continue receiving spousal support.

The stipulation of October 15, 2012 looks like a repeat of language already quoted on page 4 *supra*, but the 18-month change is significant. The way the stipulation was structured, it was as if the March 2011 stipulated judgment was being modified nunc pro tunc. It said: "Spousal Support paragraph number 3.3 shall be modified so the 18 months is substituted for 24 months at page 11, lines 5 and 6. Said paragraph shall now

---

[8]     The figures were conveniently presented to the court in a spreadsheet labeled Exhibit 1 and agreed to by both parties. Nice work.

[9]     The paperwork was prepared by Lauralin, and recites that both she and Richard are in propria persona.

read as follows: [¶] 3.3 In the event [Lauralin] becomes remarried and [her] new spouse income is less than $400,000, [Richard's] total annual spousal support obligation shall be reduced by an amount equal to 45% of [Lauralin's] new spouse income. If [Lauralin's] new spouse income is greater than $400,000 per year, [Richard's] spousal support obligation shall be reduced to zero. This provision shall not apply if [Lauralin] remarries within 18 months of this judgment. In the event that [Lauralin] remarries within 18 months of entry of this judgment, spousal support payable to [Lauralin] shall terminate."

In an income and expense declaration filed May 2014, Lauralin's new spouse's income is listed as $5,416 a month (or less than $65,000 a year). Forty-five percent of that amount is $2,337.20, which reduced Richard's $19,166 obligation to $16,828.80.

As to Richard's request in regard to spousal support, the trial court ruled the stipulated judgment, particularly as modified on October 15, 2012, waived what would otherwise be the effect of section 4337, which normally terminates spousal support on remarriage.[10] The court also ruled that the stipulated judgment waived what otherwise would be the rebuttable presumption set out in section 4323 of the decreased need for spousal support that occurs on a supported spouse's cohabitation with a nonmarital partner.[11] The court further rejected Richard's request to reduce spousal support for the first four (lean) months of 2014, ruling that Richard had not shown a material change in the (numerous) factors that govern spousal support under section 4320. The court reasoned his four-month decline in income was "only one such factor."

---

[10] Section 4337 provides in its entirety: "*Except as otherwise agreed by the parties in writing*, the obligation of a party under an order for the support of the other party terminates upon the death of either party or the remarriage of the other party." (Italics added.)

[11] The statute provides in pertinent part: "(a)(1) Except as otherwise agreed to by the parties in writing, there is a rebuttable presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a nonmarital partner. Upon a determination that circumstances have changed, the court may modify or terminate the spousal support as provided for in Chapter 6 (commencing with Section 3650) of Part 1."

The court's orders and reasoning were formally set out in a signed order filed April 17, 2015. Richard timely filed a notice of appeal from the orders of April 17, 2015, on June 4, 2015.

## III. DISCUSSION

### A. *The Amortization Issue*

We first deal with a relatively minor issue in Richard's appeal, which is his argument that if the trial court had used a 12-month *January-to-December* 2014 calendar year average, the court would have recognized that Richard had indeed shown a change of circumstances. That is, *if one isolates the 12 months of* calendar 2014 and takes an average based on those particular 12 months, exhibit 1 showed an 11 percent reduction in monthly income in comparison to March 2011 ($62,695 versus $70,166).

The issue implicates the body of law governing how fluctuating income is treated for child support. (See generally §§ 4058 [definition of income includes bonuses]; 4064 ["court may adjust the child support as appropriate to accommodate the seasonal or fluctuating income of either parent"]; *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375 (*Mosley*); *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075 (*Riddle*); *In re Marriage of Rosen* (*Rosen*) (2002) 105 Cal.App.4th 808; and Hogoboom and King, Cal. Practice Guide: Family Law (The Rutter Group 2016) ¶ 6:181, pp. 6-118-6-119.)

If we were to attempt to boil down the law involving how bonuses affect income calculations for purposes of child support determination, it would be, simply: the treatment must be "fair and representative." (See *Riddle, supra*, 125 Cal.App.4th at p. 1081.) Thus, for example, in *Mosley*, it was an abuse of discretion for the trial court to predicate a support order on the assumption the payor parent would receive a huge bonus when in fact such a large bonus "might never materialize." (*Mosley, supra*, 165 Cal.App.4th at p. 1379.) In *Riddle*, the trial judge abused her discretion by taking just the two best months of the payor spouse's most recent year of earnings to figure monthly

8

income. That was, as the appellate court said, "an embarrassingly short period on which to predict the annual income of a commissioned salesperson who works in the financial markets." (*Riddle, supra,* 125 Cal.App.4th at p. 1083.) And in *Rosen* this court held it was error for the trial court to base a goodwill valuation on an abnormally good year which was not "reasonably illustrative." (*Rosen, supra*, 105 Cal.App.4th at p. 820.)

But in this case, the trial court's decision to average out Richard's bonus over the two years prospectively May 2014 to May 2016 makes sense. This is the period the bonus was *intended* to cover. The trial court's decision corresponds to the economic substance of that bonus, which was essentially paying Richard for anticipated good results for the next *two years* going forward, and, more to the point, locked him into proverbial golden handcuffs to keep him so working for those years. Conversely, the bonus was certainly not given in payment for any work done in the first four months of 2014.

It is true that, generally speaking, as the court said in *Riddle*, there is "heavy emphasis" in the law on the income tax calendar year as the basic unit on which to calculate income. (See *Riddle, supra*, 125 Cal.App.4th at p. 1083, citing § 4059.)[12] But the court was also careful in *Riddle* to point out that the relevant time period might be longer, or perhaps sometimes even somewhat shorter, than a year, depending on the nature of the payor parent's income: "Since section[s] 4060 and 4064 are framed in discretionary terms, it would be outside the proper province of an appellate court to prescribe a bright-line rule for the precise parameters of a proper sample; after all, the whole point of discretion is a recognition that there are times when there shouldn't be a bright-line rule." (*Id*. at p. 1083; see pp. 1083-1084 [contrasting various professions].)

---

[12] The *Riddle* court's point was that *statutes*, including the Internal Revenue Code and section 4059, are framed in "whole years" as distinct from "artificially truncated and therefore unrepresentative slices of time," so it is unfair to try to take just a few months of abnormal income (whether high or low) as representative of a payor parent's true income. (See *Riddle, supra*, 125 Cal.App.4th at p. 1084.)

In the present case, amortization over two years was the most reasonable way of treating Richard's May 2014 signing bonus.

B. *The De Novo Issue*

This brings us to the main argument Richard makes regarding his child support reduction request, namely that the court should have honored the "de novo" language in the modification paragraph of the stipulated judgment and looked at circumstances anew. The subtext of this argument is that the trial court, had it done so, would have reduced his above-guideline current order down to guideline.[13]

We dare say no family lawyer is unaware of the rule requiring a change of circumstances before a support order may be modified. The reason the rule is so ubiquitous in family practice has been explained in *In re Marriage of Schaffer* (1999) 69 Cal.App.4th 801: "Because family law cases typically entail issues concerning an ongoing relationship rather than a distinct event – child support, custody and visitation, for example – the law builds in the necessary flexibility to accommodate changing circumstances by postjudgment orders to show cause hearings where the judgment has provided jurisdiction to do so. Unlike an auto accident case which might end with a tidy final judgment for money damages, the successive modifications possible in a family law proceeding can make the case resemble an unruly desert caravan strung out upon the sands." (*Id*. at pp. 807-808; see e.g., *In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1475 [overview of basic rule].)

The precise issue thus becomes whether the parties could *contract around* the change-of-circumstances rule. In support of his theory Richard points to a couple of cases, *In re Marriage of Catalano* (1988) 204 Cal.App.3d 543 (*Catalano*) and *In re*

---

[13]  The point of the Attorney General's brief in this case is to underscore the fact that parents cannot contract around certain levels of child support, since the state has an interest in the well-being of children independent of the parents. The Attorney General, however, makes no argument that simply reducing Richard's child support levels to *guideline* amounts would somehow contravene public policy.

10

*Marriage of Thomas* (1981) 120 Cal.App.3d 33 (*Thomas*) from which one might extract the possibility of modification *without* a change of circumstances.[14]

But reliance on *Catalano* is misplaced. The only support for Richard's position in *Catalano* is dicta,[15] because in *Catalano* there *was* a change of circumstances justifying the modification (in that case, upwards). (See *Catalano, supra*, 204 Cal.App.3d at p. 549 [noting increase in payor parent's earnings].) Indeed, *Catalano* is regularly cited for the proposition that a change of circumstances is *required* before a modification. (E.g., *Bodo, supra*, 198 Cal.App.4th at p. 388; *In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015.)

Moreover, the *Catalano* dicta is merely a variant of the well-established family law rule that child support obligations are law-imposed as distinct from contractual, so the court *always* retains authority to assure a minimum level of adequate child support. Indeed, from the very earliest days, California courts overrode stipulated support orders (or the total lack of provision for them in the first place) to impose or increase child support. (See *Wilson v. Wilson* (1873) 45 Cal. 399 (*Wilson*) [imposing child support where there was none in original divorce decree]. As a late 19th Century case summarized the rule: "The authority of the court to modify the decree in a proper case, and to provide when necessary that the plaintiff shall discharge his paramount duty in caring for and defraying the expense of educating his children, is not doubted. The

---

14    For purposes of this opinion, there is no need, as there was in *In re Marriage of Bodo* (2011) 198 Cal.App.4th 373 (*Bodo*) to contemplate the difference between a "material" change of circumstances as distinct from a "substantial" change of circumstances.

15    Here is the passage. Readers should pay attention to the two authorities cited at the end: "Despite the general rule requiring a showing of changed circumstances since the last prior order, a court may base its modification on a showing of *current* needs alone where, as here, the prior order called for modification based on a stipulation unaccompanied by findings about any change of circumstances existing then. ([*Thomas, supra,*] 120 Cal.App.3d [at pp.] 34-35; *Singer v. Singer* (1970) 7 Cal.App.3d 807, 812-813 [87 Cal.Rptr. 42].)" (*Catalano, supra*, 204 Cal.App.3d at p. 549.)

*stipulation of the parents cannot divest them, as against the children*, of this duty."
(*Parkhurst v. Parkhurst* (1897) 118 Cal. 18, 22 (*Parkhurst*), italics added.)[16]

But the other authority *Catalano* cited – and one which Richard also relies on directly – *Thomas,* cannot be so readily distinguished. *Thomas*, in fact, provides some real support for Richard's position. In *Thomas*, a former husband sought and obtained a $25 a month reduction in child support per child without proof or even allegation of change of circumstances. (See *Thomas, supra*, 120 Cal.App.3d at p. 34.) We now explain why we decline to follow the *Thomas* decision.

*Thomas* was a bagatelle of a decision consisting of but four paragraphs, and one of those was merely a one-sentence disposition. In *Thomas*, a former husband sought a downward modification of his support obligation from $125 to $100 a month per child, but did not provide a "court record" of the parties' circumstances at the time the original judgment was made. He got his downward modification in the trial court and the appellate court affirmed. The appellate court reasoned that, given the absence of any findings of financial circumstances, the modification proceeding itself was the "first time" the "proper amount" of child support was litigated, hence the court acted within its discretion in modifying the previous order based on the current evidence, and so affirmed the order. (*Thomas, supra,* 120 Cal.App.3d at p. 35.) In the process, the *Thomas* court articulated a rule allowing modification without changed circumstances in more open-ended terms than just a rule that allows courts to increase support upwards to assure that children are adequately supported: "The court may modify a child support order where the parties have stipulated to the amount of support; modification does not always require

---

16      *Singer* itself illustrates that rule nicely. The divorce happened in 1960, and in April 1968, the ex-wife and custodial parent agreed to a stipulated modification that only slightly increased the ex-husband's support obligation for the couple's two boys. Then the payee parent got new counsel and, in October 1968, a mere six months later, sought again to increase support. The boys were now "strapping teenagers." (*Singer, supra*, 7 Cal.App.3d at p. 810.) The trial court restricted the evidence at the October hearing to change of circumstances since the April hearing. That was error, said the *Singer* court. And in fact the passage which *Catalano* court cited (pp. 812-813 in the official reporter) itself cited the rule from *Wilson* and *Parkhurst*. (See particularly *Singer, supra*, 7 Cal.App.3d at p. 812.)

a showing of changed circumstances and in certain cases may be justified by current circumstances. (See *Moore v. Moore* (1969) 274 Cal.App.2d 698, 703 [*Moore*].)" (*Id.* at pp. 34-35.)

Moore, however, does not stand for the open-ended proposition that *Thomas* cited it for. *Moore* was simply one of the numerous California cases we have already mentioned allowing courts to modify stipulated judgments to assure adequate child support. Modifications are needed in such cases, as the *Moore* court put it, if only to prevent children becoming "public charges." (See *Moore, supra*, 274 Cal.App.2d at p. 703.) The *Moore* case arose because of a change of custody of one child, and the parent with the new custody of that child simply did not have the "'income and resources'" to adequately provide for that child's expenses. (*Id.* at pp. 702-703, quoting *Levy v. Levy* (1966) 245 Cal.App.2d 341, 358-359.)

Thomas was thus different from the situation in *Moore*. Had the *Thomas* court followed the basic California rule, it would have analyzed the wife's appeal in terms of whether the payor parent had met the burden *he had* to show a change of circumstances since the previous order. (E.g., *In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71, 77 [burden on party seeking modification, citing cases].) Under the facts as stated in *Thomas*, the result would have been different. We need merely add such a burden on the payor father in *Thomas* would have hardly been unreasonable: Surely he could have offered a declaration as to what he was making just four years earlier when he agreed to the $125 per child support order. (See *Thomas, supra*, 120 Cal.App.3d at p. 34.) In a word, *Thomas* was wrongly decided.

The reason for the change of circumstances rule is the doctrine of res judicata. The first Supreme Court case to announce the change-of-circumstances rule in regard to modification requests was *Snyder v. Snyder* (1933) 219 Cal. 80 (*Snyder*). There, in February 1932, a trial court reduced the total support owing an ex-wife and child when, just the previous October, the ex-husband had made an identical application

13

and it had been turned down.  The February attempt, in fact, contained not "a single new fact" since the October effort.  (*Id*. at p. 81.)  Our Supreme Court flatly said the court in February had "no authority" to alter the judgment, and relied on a now long-out-of-print treatise dating back to World War I, McKinney's Ruling Case Law (1914).[17]  After laying down the rule, the *Snyder* court in fact quoted from page 948 of the first volume of the Ruling Case Law hornbook, in terms that make it clear res judicata is the animating principle behind the change-of-circumstances rule:  "'Authority to modify the allowance, however, does not include the right to alter the award upon the state of case existing when the decree was entered, or to review the action of the chancellor therein.  *The parties had their day in court, with the right of appeal if the decree was deemed erroneous,* and it cannot be supposed that it was intended that the court should sit in review of its own decrees, or that the same or some succeeding chancellor presiding in the same court should, after the lapse of indefinite time, have power to reverse, alter or modify a decree for alimony upon the facts existing at the time of its entry.'"  (*Snyder, supra*, 219 Cal. at p. 81, italics added.)

As *Snyder* makes clear, Richard's reliance on the "de novo" clause is untenable.  His position would reduce family law orders and judgments to mere temporary placeholders in contravention of res judicata.

C. *Spousal Support Termination*

Section 4337 provides that spousal support will automatically terminate "[e]xcept as otherwise agreed by the parties in writing."  Richard relies on two cases which took a relatively strict view of what it takes to agree "otherwise," *In re Marriage of Thornton* (2002) 95 Cal.App.4th 251 (*Thornton*) and *In re Marriage of Glasser* (*Glasser*) (1986) 181 Cal.App.3d 149).  He argues the remarriage language in the

---

[17]     The book was a hornbook style treatise based on various selected cases from both American and British courts.  We are indebted to the California Supreme Court library for supplying us with the passage and surrounding text on which the *Snyder* court relied.

14

stipulated judgment – even as modified in October 2012 – did not meet the requisite expressivity contemplated by the statute. We disagree. The language in this case shows a clear intent to waive the normal operation of section 4337.

The case law on the topic of remarriage and waivers of section 4337 divides itself into two groups of cases: First there are cases, like *Thornton* and *Glasser,* which involved boilerplate provisions that merely said spousal support was limited to a designated term and non-modifiable.[18] In those cases the requisite specificity was not attained, so the clause did not waive the effect of section 4337 (or its predecessor) that would otherwise terminate spousal support. And second, there are cases like *In re Marriage of Cesnalis* (2003) 106 Cal.App.4th 1267 (*Cesnalis*), *Steele v. Langmuir* (1976) 65 Cal.App.3d 459 (*Steele*), and *In re Marriage of Sherman* (1984) 162 Cal.App.3d 1132 (*Sherman*) which involved tailored language which would appear on their face to contemplate the possibility of remarriage.[19]

---

[18] Here is the exact language from *Thornton*: "'The Court finds that Respondent [husband] shall pay to Petitioner [wife] for her support the sum of $400.00 per month as and for spousal support, payable one-half on the first and one-half on the fifteenth day of each month, commencing May 15, 1997, and continuing until further Order of the Court, death of either party, or for a period until March 1, 2003, whichever first occurs. Said spousal support shall be non-modifiable.'" (*Thornton, supra,* 95 Cal.App.4th 251, 253.)

The *Glasser* court did not quote the entire spousal clause, it merely characterized it this way: "The pertinent language of the support provision is: 'Spousal support shall be non-modifiable for any reason whatsoever.'" (*Glasser, supra,* 181 Cal.App.3d at p. 151.)

[19] Here is the clause from *Cesnalis*: "'4. SPOUSAL SUPPORT. Husband shall pay spousal support in the amount of $4,000.00 per month for a period of three years, . . . beginning November 1, 2000, and continuing until either party's death, or October 30, 2003, whichever occurs first, at which point spousal support will terminate absolutely. The duration of spousal support will not be modifiable under any circumstances, and the termination date stated herein is absolute, and no court shall have jurisdiction over the issue of spousal support, regardless of whether any motion is made on, before or after October 30, 2003. The parties stipulate that the marriage was one of short duration, and otherwise have bargained carefully for the termination of support contained herein.'" (*Cesnalis, supra,* 106 Cal.App.4th at p. 1271.) Readers should note here that an earlier sentence made explicit reference to termination on remarriage ("Husband shall pay spousal support in the amount of $4,000.00 per month, . . . continuing until either party's death, the remarriage of Wife, or September 30, 2003, whichever occurs first . . . ." (see *id.* at p. 1270) was modified by the parties.

15

Here, arguably even more than in *Cesnalis*, the stipulated judgment – particularly as modified in October 2012 – evidences an intention by Richard to waive the termination of support that would normally have occurred on Lauralin's remarriage. The key fact (one not highlighted by Richard in his briefing) is that under the plain terms of the original March 2011 judgment, Lauralin's October 2012 remarriage would have terminated support. Period. The new language had the effect of eliminating the clear termination of support about to be triggered by Lauralin's imminent remarriage. It is hard to avoid the conclusion it reflects an intention to excuse a *particular* remarriage from any termination of support that might otherwise occur.

The focus on the upcoming October 2012 remarriage further disposes of Richard's argument ad horrendum to the effect that Lauralin could keep divorcing and remarrying and Richard would still have to keep paying support. At its best, Richard's argument is premature. We deal only with her October 2012 remarriage. As to that, there was a clear intention the remarriage *not* terminate support.

There is language in *Thornton* which can be read to require there be an express mention of section 4337: "If the parties wish to make a written agreement to waive the remarriage provision of section 4337, they must at a minimum expressly state

The relevant language from the clause in *Sherman* was: "9.01. Subject to the provisions of Paragraph 9.02, and expressly conditioned thereon, [Husband] shall pay to [Wife] for her support: [¶] (a) The sum of $500.00 per month commencing January 22, 1980 and continuing thereafter until close of the Residence sale escrow; [¶] . . . . [¶] 9.02. Each payment made under the provisions of Paragraph 9.01 shall be paid when due; provided however, that any and all obligation and liability of [Husband] to make such payments, or any of them, forthwith shall cease and terminate on the death of the [Wife]. [¶] 9.03. [Wife] waives and relinquishes any and all rights that she may now have or later acquire to receive any spousal support other than as provided in Paragraph 9.01, and the parties agree that the amount of support, the method of payment and the terms and conditions of termination of support, all as set forth in Paragraphs 9.01 and 9.02, shall not be modifiable by the parties or by any court on any ground." (*Sherman, supra*, 162 Cal.App.3d at p. 1135.)

Finally, the language in *Steele* was this: "Husband agrees to pay to Wife as and for alimony, the sum of Five Thousand Dollars ($5,000.00) forthwith, and the sum of Eight Hundred Dollars ($800.00) per month payable on the first day of each and every month commencing on the first day of January, 1971 and to continue until the death, remarriage, or expiration of twenty (20) years from and after the said first day of January, 1971, whichever event shall first occur. In the event Wife enters into a meretricious relationship with a man, then the commencement of such relationship shall be deemed to be the equivalent of remarriage. The provisions of this paragraph providing for payments by Husband to Wife, shall not be subject to modification or revocation by Court Order, or otherwise, and are to be deemed non-modifiable, regardless of any change of circumstances, except for the contingencies contained herein." (*Steele, supra*, 65 Cal.App.3d at pp. 461-462.)

16

that the supported spouse's remarriage will not terminate spousal support." (*Thornton, supra*, 95 Cal.App.4th at p. 257.) That reading, however, has been convincingly debunked by the *Cesnalis* court as going beyond what section 4337 actually requires: "Taken literally, this statement [quoted in the footnote above] would mean that particular words *are* required to waive section 4337, and that extrinsic evidence has no relevance in resolving whether a written agreement has waived the section 4337 remarriage provision. Section 4337 does not go so far as to require a written agreement *expressly stating* that the supported spouse's remarriage will not terminate spousal support." (*Cesnalis, supra*, 106 Cal.App.4th at p. 1276.)

Richard's argument that the trial court should have taken extrinsic evidence regarding the issue of remarriage was effectively waived at the trial level. The trial judge made it very clear that Richard could have put on evidence in regard to his RFO, or his trial-level counsel could argue the nuances of the marriage clause, but not both. Richard's trial counsel chose argument. But even then, the trial court allowed each side to file an additional declaration, a procedure to which Richard's counsel expressly agreed. As it turned out, Richard did not proffer any new facts concerning the surrounding circumstances of the October 2012 stipulation. He cannot now complain about not having done so.

D. *Spousal Support Reduction*

Finally, we reach the issue of those first four lean months in 2014 in which Richard's income was unquestionably lower than the March 2011 levels on which his support payments were – at least in part – predicated. The trial judge rejected that lowering, citing the point that income is only one of many factors under section 4320.

The trial judge's understanding of the law bearing on the modification request was spot on. The governing standard on the issue of whether support might (or should) have been modified is this: Whether to modify is a matter of broad discretion. In exercising that discretion the court must consider factors set out in section 4320. The

court has discretion as to how to weigh each factor. And failure to weigh the factors is an abuse. (*In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1273.)

In this case, the trial judge's decision not to reduce support for the first four months of 2014 easily passes an abuse of discretion test. The income reduction was only of a short duration (four months), and the original judgment recited that the original support level was significantly below the marital standard. Additionally, Lauralin's remarriage had, pursuant to the terms of the parties' remarriage agreement, already reduced the support level. And there was no dispute concerning the need for Lauralin to remain as a full-time caretaker for the children (including the paralyzed adult Daniel). Her caretaking obligations obviously make it harder for her to obtain education, retraining, or just refreshed experience necessary to re-enter the job market. The trial judge was entitled to consider all those things. He astutely recognized that income was not the end of the inquiry.

## IV. DISPOSITION

The orders appealed from are affirmed. Lauralin shall recover her costs on appeal.

BEDSWORTH, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.

18

Filed 10/03/2016

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of LAURALIN ANDERSON COHEN and RICHARD COHEN. | |
| LAURALIN ANDERSON COHEN, Respondent, v. RICHARD COHEN, Appellant; ORANGE COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES, Intervener. | G052058 (Super. Ct. No. 06D009414) ORDER MODIFYING OPINION AND GRANTING REQUEST FOR PUBLICATION (PARTIAL); NO CHANGE IN JUDGMENT |

On the court's own motion, it is ordered that the opinion filed herein on September 7, 2016, be modified in the following particulars:

1. On page 2 of the slip opinion, first introductory paragraph, last sentence, add a comma between "guideline" and "and his request".

---

\*     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.C and III.D

2. On page 12 of the slip opinion, second full paragraph beginning with "*Thomas* was" delete the phrase "one of those was merely a one-sentence disposition" and replace with "dealing with unusual circumstances that could no longer occur."

3. On page 12, second full paragraph, second sentence, in the phrase "but did not provide" change the word "did" to "could."

4. On page 13 of the slip opinion, second full paragraph, last sentence, delete the last sentence which currently reads "In a word, *Thomas* was wrongly decided" and replace with "The *Thomas* court, faced with unusual facts that made their result just, had no reason to conduct this analysis."

This modification does not effect a change in the judgment.

Both appellant and respondent have requested that our opinion in this matter, filed September 7, 2016, be certified for publication. After reviewing the request, we have concluded the case meets the requirements for partial publication. Pursuant to California Rules of Court, rule 8.1105(b), (c)(3) and (5), the request is GRANTED.

The opinion is ordered published in the Official Reports.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.


2