Filed 8/14/20  Marriage of Valek CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re the Marriage of DEBORAH AND WESLEY VALEK. | |
| DEBORAH M. VALEK, | E071884 |
| Respondent, | (Super.Ct.No. FAMMS1400476) |
| v. | OPINION |
| WESLEY J. VALEK, | |
| Appellant; | |
| SAN BERNARDINO COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES, | |
| Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Susan Slater, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Daniel G. McKeekin, for Appellant.

Law Offices of Sharon Bruuner, and Sharon Bruuner; Law Offices of Valerie Ross and Valerie Ross for Respondent Deborah M. Valek.

1

No appearance from Respondent San Bernardino County Department of Child Support Services.

## I.

## INTRODUCTION

Appellant, Wesley Valek, appeals a post-judgment child support order. He contends the child support hearing was not properly conducted, resulting in being deprived of the opportunity to testify. Wesley further contends the trial court abused its discretion by calculating child support based on an erroneous time share assessment of zero. We reject Wesley's contentions and affirm the post-judgment child support order.

## II.

## FACTS AND PROCEDURAL BACKGROUND

Wesley and respondent, Deborah Valek, were married in 2005. They have two children, Tyler (born in 2006) and Melanie (born in 2010). In 2014, Wesley and Deborah separated and Deborah filed a petition for dissolution of marriage.

On October 4, 2017, Deborah filed a motion for modification of the December 10, 2014, child support order. The order required Wesley to pay Deborah $392 in monthly child support, based on a 32 percent time share. The hearing on the motion was continued numerous times. Wesley and respondent, the San Bernardino County Department of Child Support Services (CSS), filed responsive declarations. On August 21, 2018, Wesley filed a child support hearing brief providing a statement of his gross income for each month, from October 2017, through July 2018.

On August 21, 2018, Wesley and Deborah executed a stipulation to uncontested dissolution of marriage, with jurisdiction reserved over child support and arrears, retroactive to November 1, 2017. The court entered the stipulation and order. The parties also stipulated that, although guideline child support was $1,230, Wesley would pay $625 in temporary support until the hearing on modification of support on October 29, 2018.

On October 5, 2018, the court entered a stipulated judgment of marital dissolution of Wesley and Deborah's marriage, incorporating the parties' August 21, 2018, stipulation to dissolution of their marriage, with the court reserving jurisdiction over child support.

On October 11, 2018, Deborah served Wesley and CSS with copies of Wesley's paystubs (from May 7, 2017 to September 14, 2018), which Deborah subpoenaed from Wesley's employer, Tuff Shed. Deborah stated in her updated income and expense declaration (IED) filed on October 11, 2018, that she was living in Nevada with the two children; she estimated Wesley's gross monthly income was $7,718.81, based on his subpoenaed paystubs; and her average monthly income for the past year was $1,094.

Deborah also filed a declaration stating that Wesley had not visited the children since October 2016, and she continued to pay for the children's daycare without Wesley's assistance, totaling $1,724, from January 2018 through September 19, 2018. In addition, Wesley had recently purchased an investment rental, and during the past year, Wesley had taken vacations to New York, India, and Las Vegas, yet failed to visit his children.

3

Wesley stated in his updated income and expense declaration (IED), filed on October 26, 2018, that he worked for Tuff Shed in sales, as a design consultant, and had worked there since May 2017. He worked about 20 hours a week, with an average gross monthly income for the past year of $2,221.73 and an average of $341.13 in overtime pay. Three hundred and thirty dollars a month was deducted from his pay for the children's health insurance. Wesley further stated that his financial situation had changed significantly over the last 12 months. After he had completed a military contract, his job changed in March 2018, and his hours were cut. Wesley stated his two children were with him 25 percent of the time. Wesley attached to his IED copies of his paystubs for the most recent period of August 26, 2018, through October 6, 2018.

A. *October 29, 2018, Hearing on Motion for Modification of Child Support*

On October 29, 2018, the court heard Deborah's October 4, 2017, motion for modification of the December 10, 2014, child support order and for determination of support arrears as of November 1, 2017. The court initially noted that it had not had a chance to review the matter before the hearing. The court therefore wanted first to discuss the matter with counsel. Counsel for CSS noted there was a stipulation and order, entered on August 21, 2018, in which the parties had agreed to temporary support and the court reserving jurisdiction over child support arrears, going back to November 1, 2017. The court reviewed the stipulation.

The parties confirmed they had filed and served on CSS relevant documents and had updated their IEDs. CSS's counsel, Mary Langevin, confirmed that Deborah's

4

attorney, Sharon Brunner, had provided her with a year of Wesley's paystubs. Langevin had relied on the paystubs in calculating guideline child support, rather than relying on Wesley's attorney's summary. Langevin noted there were two guideline figures for support, one for the period of November 1, through December 31, 2017, and the other for January 1, 2018 through September 30, 2018, Wesley's last pay period. Brunner asserted that at the last two hearings, Wesley's attorney, Daniel McMeekin, had under-reported Wesley's income. Brunner stated that this was why she had provided CSS and the court with his paystubs to show his actual income. She also provided McMeekin with copies of the paystubs.

McMeekin responded that he had provided a hearing brief delineating how much money Wesley was earning each month. McMeekin stated that Wesley would testify that those figures accurately stated his gross income. The court asked McMeekin how Wesley's testimony would differ from the paystub amounts. McMeekin responded that he did not know. The court asked McMeekin why he had not compared the paystub amounts with the amounts Wesley was going to attest to. McMeekin said he did not know how to respond. The court replied, "if you know what he's going to testify to and you have a paycheck stub to compare it to, . . . I don't understand how you don't understand or how you don't get it." The court said that it also did not understand why McMeekin thought that the amounts Wesley would testify to would take precedence over the amounts stated in his paystubs. McMeekin replied that the court was assuming Wesley would testify to "something other than what is in his paycheck stubs. I don't

5

think that he is." McMeekin then confirmed that Wesley would not testify to anything different than what was stated in his paystubs.

The court asked McMeekin why, then, was he disagreeing with what the paystubs stated. McMeekin said there was no disagreement. The court asked what Wesley would testify to. McMeekin said Wesley would testify to his gross income, as set out in his hearing brief, but acknowledged the paystubs showed this information. The court said it did not make sense that Wesley would testify because, based on McMeekin's statements to the court, the paystub amounts would be the same as what Wesley would testify to. McMeekin agreed "[t]hey should be."

The court asked McMeekin why the guideline support would be any different than the stated guideline amount which was based on the paystubs. McMeekin responded that the stated guideline amount was $1,100 a month, whereas Wesley's IED stated he made $1,500 during the last month. Therefore Wesley would testify that his work hours had significantly decreased. His income had decreased the last few months and he also no longer was getting commissions. McMeekin acknowledged that Wesley's year-to-date income might justify the $1,100 guideline child support but argued it was too high because Wesley's income was decreasing. He was making much less than he was making six months before. The court stated that it would be inappropriate to consider what Wesley might make in the future. The court would only consider his year-to-date income. CSS's attorney, Langevin, agreed, noting CSS had provided two guidelines, for

6

November 2017 through December 2017, and for January 2018 through September 22, 2018.

The court stated it did not see the need for Wesley's testimony on the year-to-date guideline child support and invited McMeekin to respond. McMeekin stated that he had provided paystubs for the last three months because that was when Wesley's work hours began to decrease. McMeekin said Wesley would testify he was looking for another employer because his current employer, Tuff Shed, was not respectful of Wesley and was not allowing him to maximize his earnings. The court noted that if Wesley's circumstances substantially changed and he began consistently visiting the children, he could then request modification of child support.

McMeekin argued the court should consider what Wesley was currently earning and consider prospectively what he would be earning, instead of looking at what he made during the past 12 months. McMeekin asserted that, with Wesley only earning $1,500, ordering him to pay $1,100 in guideline support would invite a "terrible situation" causing Wesley to be in arrears. The court responded that the year-to-date approach was appropriate. The court acknowledged that it was anticipated Wesley would say he was looking for another job because his income had been decreasing during the past three months, and would continue to do so. McMeekin agreed this was what Wesley would state. The court further acknowledged that McMeekin wanted the court to disregard the year-to-date method for determining guideline support and base support on what Wesley made in the last three months.

Deborah's attorney, Brunner, responded that she agreed with the court that the year-to-date method should apply. Because there was some confusion as to whether Wesley's hours were cut during the past three months or last three weeks, McMeekin asked Wesley how long his hours had been cut. Wesley stated his hours had been cut during the past two months. Brunner argued that, as of August 2018, Wesley's year-to-date monthly income average was $4,700. In addition, Wesley had a house flipping business, Llama Peak LLC, which he had not disclosed, and he had not accurately disclosed his income in his IEDs. Wesley had also been going on lavish vacations to India, Peru, and other places.

McMeekin responded that Brunner had misinterpreted Wesley's paystubs. This was the problem with the guideline support. The court asked McMeekin if Wesley's income had declined during the past three weeks or past three months. McMeekin said it was "closer to three months," according to Wesley. McMeekin asserted Brunner was "seriously misinterpreting his pay stubs." The court responded that it did not believe CSS was seriously misinterpreting Wesley's paystubs. Langevin agreed, noting CSS was merely following the applicable law. McMeekin explained that Wesley's statement in his IED, that he changed jobs on March 2, 2018, referred to Wesley's job changing from receiving commissions, to an hourly job with his same employer. McMeekin further stated that the paystubs did not require an explanation if interpreted properly.

The court stated it was going to read Deborah's declaration filed on October 11, 2018, and Wesley's hearing brief. After doing so, the court asked McMeekin to address

8

Deborah's statements in her declaration. McMeekin stated that Wesley had a wealthy fiancé and "potential mother-in-law," who paid for Wesley's vacations. His Llama Peak LLC company began in November 2016. His company built Tuff Sheds. Llama Peak LLC had not done any business for a year and a half (since about April 2017). The last time he filed a tax return for the company was in 2016.

Citing *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075 (*Riddle*), and Family Code sections 4060 and 4064,[1] CSS's attorney, Langevin, asserted that the applicable law was that, if a party has fluctuating income, the income must be calculated using a representative time period of at least 12 months. Langevin explained that, even though Wesley asserted he earned less income during the last three months, CSS adhered to the law, which requires determining guideline support based on an average income over a 12-month period. Langevin thus recommended that, as to the period of November 1, 2017 to December 31, 2017, the court order Wesley to pay $1,041 a month, consisting of $930 in monthly guideline support, plus $111 a month, for one-half the average cost of monthly day care. Langevin recommended that, as to the period of January 1, 2018, through September 22, 2018, the court order Wesley to pay $1,215 a month, consisting of $1,104 in monthly guideline support, plus $111, for one-half the average cost of monthly day care.

---

[1] Unless otherwise noted, all statutory references are to the Family Code.

McMeekin responded that the law Langevin relied on was inapplicable because that law applied to seasonal employment or jobs such as selling real estate, in which there is a history of fluctuating income. Wesley was arguing his hours had been cut, as opposed to having a history of fluctuating hours. McMeekin further argued that the recommended guideline support was incorrect because it was based on a zero time share of physical custody/visitation by Wesley, whereas the judgment entered on October 5, 2018, gives Wesley "roughly" a 25 percent time share. The court asked when Wesley had last visited the children. Wesley replied, "October 2016." The court responded that his time share for guideline support was therefore zero.

Brunner argued that Wesley had fluctuating commissions, hours, and base pay, and therefore the court should average his base pay income during the past 12 months. McMeekin disagreed, noting that Wesley had not "been on commission since March, so there's no fluctuation anymore." Instead, he had been paid hourly for the past six months, without any commissions. In addition, Wesley's hours had decreased from 40 to 20.

B. *October 29, 2018, Child Support Order*

After hearing argument and considering the evidence, the court ordered Wesley to pay $1,041 a month in monthly child support arrears for November 1, 2017 to December 31, 2017. The court further ordered Wesley to pay $1,215 in monthly child support, for January 1, 2018 to September 22, 2018, and continuing thereafter. The court ordered CSS to enforce payment of the court-ordered child support by wage assignment payable

10

through the California State Disbursement Unit.  Attached to the written order and amended order is a computer printout showing Wesley and Deborah's  income and percentage of time they each spent with the children.  The order states that the printout, which shows the calculation of guideline child support, shall become the court's findings.

After the court announced the order, McMeekin suggested that CSS should "examine" Wesley to explain the discrepancy in his paystubs and his actual income, because the paystubs were being misinterpreted.  The court responded that the hearing was over and the order would stand.

### III.

### CHILD SUPPORT HEARING

Wesley contends the child support hearing on October 29, 2018, was not conducted in accordance with *Elkins v. Superior Court* (2007) 41 Cal.4th 1337 (*Elkins*). Wesley argues that, as a consequence the court committed prejudicial error by depriving him of the opportunity to testify.  *Elkins* confirmed that the rights of litigants in family law matters are the same as the protections afforded in other civil proceedings.  (*Id*. at p. 1345.)

In *Elkins*, a local superior court rule and a trial scheduling order in the family law court provided that in dissolution trials, parties must present their case by means of written declarations.  Witness testimony was not allowed except in "unusual circumstances," although upon request parties were permitted to cross-examine declarants.  In addition, parties were required to establish in their pretrial declarations the

11

admissibility of all exhibits they sought to introduce at trial.  In *Elkins*, the husband's pretrial declaration failed to establish the evidentiary foundation for all but two of his trial exhibits.  As a consequence, the court excluded his 34 remaining exhibits.  Without the exhibits, and without oral testimony to present his case or establish a foundation for his exhibits, the husband rested his case.  In effect, the trial proceeded "'quasi by default,'" resulting in disposition of the parties' property claims substantially in the manner requested by the wife.  (*Elkins*, *supra*, 41 Cal.4th at pp. 1344-1345.)

The husband in *Elkins* challenged the local court rule and trial scheduling order on the grounds they were inconsistent with his right to due process, and that they conflicted with various provisions of the Evidence Code and the Code of Civil Procedure.  The *Elkins* court concluded it need not reach the husband's constitutional claim because, "as applied to contested marital dissolution trials, the rule and order are inconsistent with various statutory provisions.[]  As we explain below, we reach this conclusion because, *pursuant to state law, marital dissolution trials proceed under the same general rules of procedure that govern other civil trials*.  Written testimony in the form of a declaration constitutes hearsay and is subject to statutory provisions governing the introduction of such evidence.  Our interpretation of the hearsay rule is consistent with various statutes *affording litigants a 'day in court,' including the opportunity to present all relevant, competent evidence on material issues, ordinarily through the oral testimony of witnesses testifying in the presence of the trier of fact*."  (*Elkins*, *supra*, 41 Cal.4th at p. 1345, italics added, fn. omitted.)

The *Elkins* court further noted that "trial courts possess inherent rulemaking authority as well as rulemaking authority granted by statute. ([Citation]; Code Civ. Proc, §§ 128, 177, 575.1; Gov. Code, § 68070.) 'It is . . . well established that courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them. [Citation.] . . . ". . . That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation . . . in order to insure the orderly administration of justice. [Citation.]"'" (*Elkins*, *supra*, 41 Cal.4th at p. 1351, citing *Rutherford* [*v. Owens-Illinois* (1997) 16 Cal.4th 953,] 967.) But "local courts may not create their own rules of evidence and procedure in conflict with statewide statutes." (*Elkins*, *supra*, at p. 1352.) The *Elkins* court emphasized that, "[a]lthough some informality and flexibility have been accepted in marital dissolution proceedings, such proceedings are governed by the same statutory rules of evidence and procedure that apply in other civil actions (with exceptions inapplicable to the present case)." (*Elkins*, *supra*, at p. 1354; see § 210.)

In accordance with these rules of practice and civil procedure, "[a]ll relevant evidence is admissible, including evidence bearing on the issue of witness credibility (Evid. Code, §§ 210, 351), and the oral testimony of witnesses supplies valuable evidence relevant to credibility, a critical issue in many marital dissolution trials. Permitting oral testimony rather than relying upon written declarations also is consistent with the historically and statutorily accepted practice of conducting trial by means of the oral

13

testimony of witnesses given in the presence of the trier of fact. (See Evid. Code, §§ 711, 780; Code Civ. Proc., §§ 2002, 2005.)" (*Elkins*, *supra*, 41 Cal.4th at pp. 1356-1357.)

The court in *Elkins* therefore held that, "consistent with the traditional concept of a trial as reflected in provisions of the Evidence Code and the Code of Civil Procedure, we conclude that respondent's rule and order calling for the admission and use of declarations at trial conflict with the hearsay rule." (*Elkins*, *supra*, 41 Cal.4th at pp. 1359-1360.) The *Elkins* court further concluded that, "the trial court applied the sanction provision of its local rules in a mechanical fashion without considering alternative measures or a lesser sanction, resulting in the exclusion of all but two of petitioner's 36 exhibits. Had the court permitted petitioner to testify, he could have provided some foundation for his exhibits. In applying the local rule and order mechanically to exclude nearly all of petitioner's evidence—and proceeding, in the words of the trial court, 'quasi by default'—the trial court improperly impaired petitioner's ability to present his case, thereby prejudicing him and requiring reversal of the judgment." (*Id*. at p. 1365.)

In the instant case, Wesley did not request to testify, request any other witnesses testify, or assert any evidentiary or procedural objections. There also was no local court rule or order prohibiting such evidence. Wesley was permitted to argue his theory regarding child support and present admissible evidence, including oral testimony. Wesley's attorney agreed that Wesley would testify to the same amounts stated in the paystubs and that the guideline support thus would be the same. The trial court therefore did not unreasonably conclude that Wesley's testimony was not necessary. Wesley and

14

his attorney did not demonstrate that Wesley would provide any useful relevant information, other than that which was already provided in the paystubs. Wesley's attorney, McMeekin, mentioned that the paystubs had been misconstrued, but McMeekin did not explain in what way they were misconstrued, lay a foundation establishing Wesley could provide information demonstrating this, or specifically ask the court to allow Wesley to testify.

Unlike in *Elkins*, Wesley has not established that he was deprived of his "'*day in court,' including the opportunity to present all relevant, competent evidence on material issues, ordinarily through the oral testimony of witnesses testifying in the presence of the trier of fact*." (*Elkins*, *supra*, 41 Cal.4th at p. 1345, italics added.) Also, unlike in *Elkins*, this was not a "quasi by default" proceeding, in which the court refused to consider relevant, admissible trial evidence requested by Wesley. The trial court heard lengthy argument and considered relevant evidence submitted by the parties. We thus conclude Wesley was not deprived of a fair hearing. We reject Wesley's contention the child support hearing fell "far short of the *Elkins* mandate."

Wesley's reliance on *In re Marriage of Zywiciel* (2000) 83 Cal.App.4th 1078 (*Zywiciel*), is also misplaced. Wesley submits that the child support hearing in the instant case did not comply with *Zywiciel* hearing requirements. In *Zywiciel*, the judgment of dissolution incorporated the Zywiciels' marital termination agreement, which did not include spousal support but instead reserved jurisdiction on the issue. Six years later, Mrs. Zywiciel (Susan) moved for spousal support. Her moving papers consisted of a

15

form application for an order and a supporting declaration, requesting guideline support. Susan declared she needed spousal support because there was a "great disparity" between her income and that of Mr. Zywiciel (Philip), and her expenses had increased. Philip declared that Susan's increased living expenses were short-lived and over.

Philip appealed the trial court order awarding Susan permanent spousal support. Philip argued there was insufficient evidence to award spousal support. The court in *Zywiciel* concluded "[t]he hearing was so informal that it was difficult to recognize as a hearing." (*Zywiciel*, *supra*, 83 Cal.App.4th at p. 1080.) The hearing consisted of Susan and Philip and their attorneys meeting with the judge and discussing the issues. Susan and Philip were sworn as witnesses, but neither was called to testify. At one point, Susan was asked a few questions about her education, but Philip was never called upon to speak. Most of the "hearing" consisted of counsel providing figures and other information from the financial statements their clients had filed, which the judge plugged into the DissoMaster computer program used for calculating temporary spousal support. (*Id*. at p. 1080.)

The *Zywiciel* court stated that it appeared "that the judge impermissibly relied on the DissoMaster. Her *only* comment upon making the award was a reference to that program, and she ordered it attached to the minute order. Since there was no evidence offered on many of the section 4320 factors, we do not see how the judge could have made the award except by . . . beginning with the proposed temporary support figure and

16

adjusting it downward," which was improper. (*Zywiciel*, *supra*, 83 Cal.App.4th at p. 1082.)

The court in *Zywiciel* rejected Susan's counsel argument that the record contained the requisite evidence supporting increasing spousal support. (*Zywiciel*, *supra*, 83 Cal.App.4th at p. 1082.) Susan's attorney argued Susan's IED listed her assets, but it did not. Her IED left blank the spaces provided to list her assets. The *Zywiciel* court concluded Susan's failure to accurately list her assets was significant, particularly since she had received the former family residence in the divorce and continued to reside there. (*Id.* at p. 1082.) The *Zywiciel* court further noted Susan's attorney made several other misrepresentations about information in the record that was not there. (*Id.* at pp. 1082-1083.)

The *Zywiciel* court noted that "[i]t may be that these matters were discussed between counsel and the trial judge in chambers. But they did not make their way into the record. We recognize the salutary ends that informal hearings can accomplish in dissolution matters. We understand the idea that informality may serve to defuse these often incendiary cases. But at some point—preferably before the parties reach the Court of Appeal—a record must be made. If the court is considering something other than the DissoMaster program, the record has to reflect that. If there is evidence pertinent to the issues the court is resolving, it has to be received. A hearing at which rancor is avoided accomplishes little if the problems between the parties are not resolved in a way that

17

ensures finality, including the possibility of appellate review." (*Zywiciel*, *supra*, 83 Cal.App.4th at p. 1083.)

The *Zywiciel* court reversed the spousal support order, concluding that all the record showed was that "the court plugged the numbers into the DissoMaster temporary support guideline and made some sort of dead-reckoning adjustment. Since we can find no indication the judge considered section 4320 and exercised her independent judgment in arriving at her award, we cannot uphold it." (*Zywiciel*, *supra*, 83 Cal.App.4th at p. 1083.)

Here, unlike in *Zywiciel*, *supra*, 83 Cal.App.4th 1078, the record shows that, although the child support hearing was conducted somewhat informally, with a lengthy discussion between counsel and the court, along with occasional responses by Wesley, the entire hearing was on the record, evidence was presented, and there were no objections to the manner in which the hearing was conducted. The record shows that the parties were not precluded from presenting relevant, admissible evidence or testimony, although the court indicated after extended discussion, that Wesley's testimony regarding his income would add nothing, because his attorney agreed that Wesley's testimony would be consistent with the paystubs.

Wesley nevertheless argues the court erred in not permitting him to testify. However, neither Wesley nor his attorney, McMeekin, requested that Wesley testify or present any other relevant evidence. (*Mendoza v. Ramos* (2010) 182 Cal.App.4th 680.) McMeekin asserted that the paystubs were not being properly construed but did not

explain in what way. McMeekin also did not explain how Wesley would be able to construe the information in his paystubs in a way other than that asserted by Deborah and CSS. Instead of requesting that Wesley testify, the parties ultimately relied primarily on their filings, arguments of counsel, and Wesley's paystubs. Wesley thus forfeited his objections to Wesley not testifying and to the manner in which the hearing was conducted. (*Id*. at p. 687; see *Estate of Westerman* (1968) 68 Cal.2d 267, 279 [issues not raised in the trial court may not be raised for the first time on appeal].)

Unlike in *Zywiciel*, this is not a spousal support case in which the trial court calculated spousal support by merely plugging numbers, unsupported by evidence, into the DissoMaster temporary support guideline and by making "some sort of dead-reckoning adjustment." The instant case involves child support in which the record shows the trial court made reasonable factual determinations and appropriately exercised its independent judgment based on counsels' arguments and relevant facts established by Wesley's paystubs and information provided in the parties' updated IEDs.

Wesley argues that his paystubs constituted inadmissible hearsay evidence, and his IED, with attached recent paystubs (8/26/18-9/8/18, 9/9/18-9/22/18, 9/23/18-10/6/18), was not admitted into evidence. However, the transcript of the October 29, 2018, child support hearing shows that the court considered all of the paystubs, including the subpoenaed paystubs for Wesley's income (from May 7, 2017 through September 8, 2018), and two additional paystubs provided by Wesley, for September 9, 2018, through October 6, 2018. Wesley's attorney confirmed that, if Wesley testified to his income, his

19

testimony would be the same as stated in the paystubs. The trial court thus reasonably concluded Wesley's testimony was unnecessary.

Furthermore, unlike in *Elkins*, Wesley has not demonstrated any prejudice caused by the manner in which the trial court conducted the child support proceeding. The record shows that, had Wesley demonstrated that his testimony was not merely cumulative of the paystub information, the court would likely have permitted his testimony. Most telling is the fact that Wesley agreed the paystubs were accurate and did not object to the court relying on the paystubs when calculating child support. In addition, he did he request to introduce any additional evidence, and he did not object to the manner in which the hearing was conducted. Under Code of Civil Procedure section 475, "No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed."

The record shows that the court considered McMeekin's arguments, including his contention the paystubs showed that Wesley's work hours and income had decreased within the past two or three months and he was no longer receiving commissions. Nevertheless, the court concluded that the proper method for calculating child support was to base it on Wesley's average income for approximately the past 12 months under

*Riddle*, *supra*, 125 Cal.App.4th 1075, rather than basing it on Wesley's income reflected in his paystubs during the past three months. Wesley has not demonstrated that the court would have decided child support any differently or relied on any different factors or evidence, had the child support hearing been conducted any differently or had Wesley testified. Thus, if there was any such error, it was harmless error which does not require reversal of the child support order.

Wesley further argues that under *Riddle*, *supra*, 125 Cal.App.4th 1075, the court was not required to base child support on his 12-month income average. Wesley asserts the court had the discretion to rely on his average monthly income during a shorter, three-month period and therefore the court should have permitted him to present evidence on the need to do so.

In *Riddle*, the court held that the trial court abused its discretion by calculating income for pendente lite child and spousal support orders based on the husband's latest two months of earnings as a commissioned financial advisor at an investment firm. (*Riddle*, *supra*, 125 Cal.App.4th at p. 1077.) The court in *Riddle* concluded the trial court should have used a properly representative sample, which presumptively would have been the previous 12 months. (*Ibid.*) Because the husband's monthly income fluctuated, the *Riddle* court relied on sections 4060 and 4064, "the two statutes which deal with the problem of calculating fluctuating income for support orders." (*Riddle*, *supra*, at p. 1081.)

The court in *Riddle* explained that "[t]he aim of section 4060 is to give a trial court discretion to adjust the annual net adjustable income required for a support order when dividing net disposable income by 12 'does not accurately reflect the actual or prospective earnings of the parties.' Section 4064 gives a trial court the authority to adjust a child support order 'as appropriate to accommodate seasonal or fluctuating income of either parent.' While both statutes are framed in discretionary terms, it is also well established that the discretion must be a reasonable one, '"exercised along legal lines, taking into consideration the circumstances of the parties, their necessities and the financial ability of the [supporting spouse]."'" (*Riddle*, *supra*, 125 Cal.App.4th at p. 1081.)

As noted in *Riddle*, the purpose of using this method of calculating child support, when income fluctuates, is to provide a reasonable predictor of what each parent will earn in the immediate future. (*Riddle*, *supra*, 125 Cal.App.4th at p. 1081; see *County of Placer v. Andrade* (1997) 55 Cal.App.4th 1393, 1396 ["The assumption underlying these calculations is that past income is a good measure of the future income from which the parent must pay support."].) "The theory is that the court is trying to predict *likely* income for the immediate *future*, as distinct from extraordinarily high or low income in the *past*." (*Riddle*, *supra*, at pp. 1081-1082.)

In the instant case, Wesley's paystubs showed that his income had fluctuated during the past year, and as of March 2018, he was no longer receiving commissions but started receiving overtime pay (1.5 hours) and double time pay. After he no longer

received commissions, Wesley's income continued to fluctuate based on the number of hours he worked. Therefore it was not unreasonable for the court to calculate child support and arrears based on Wesley's average income for November 2017 through September 2018. Wesley did not provide any evidence, other than paystubs, to refute this approach nor did his attorney demonstrate another method was justified.

McMeekin argued that Wesley's hours and income had recently decreased, as reflected in Wesley's most recent two paystubs, for the pay periods of September 9, 2018, to September 22, 2018 (45 hours), and September 23 to October 6, 2018 (32.61 hours). Although the two most recent paystubs showed there was a decline in Wesley's hours shortly before the child support hearing, the other paystubs showed that Wesley's hours and income had fluctuated throughout the past year, including in November 2017. His November 5, 2017 to November 18, 2017, paystub shows 43.14 hours. While Wesley's most recent two paystubs, in September 2018, show a significant decrease in his hours, most of his paystubs show much higher fluctuating work hours, including his two August 2018 paystubs. During August 12, 2018 to August 25, 2018, Wesley worked 73.8 hours, and from August 26, 2018 to September 8, 2018, he worked 61.90 hours..

As noted in *Riddle*, "the time period on which income is calculated must be long enough to be *representative*, as distinct from *extraordinary*." (*Riddle*, *supra*, 125 Cal.App.4th at p. 1082) The *Riddle* court further stated: "It is a manifest abuse of discretion to take so small a sliver of time to figure income that the determination essentially becomes arbitrary. And under the facts of this case, no other

23

word *but* 'arbitrary' properly describes the trial court's selection of the last two months to determine Husband's income. A mere *two months* is an embarrassingly short period on which to predict the annual income of a commissioned salesperson who works in the financial markets." (*Id*. at p. 1083.)

The *Riddle* court recognized that, because of statutory discretion provided in sections 4060 and 4064, it would be inappropriate to prescribe a bright-line rule for the precise parameters of a proper sample for averaging income. Nevertheless, the court in *Riddle* concluded that "statutes appear to create a presumption that the most recent 12 months is certainly *an* appropriate period in most cases." (*Riddle*, *supra*, 125 Cal.App.4th at p. 1083.) "In short, there is a heavy emphasis on 12 months or 'annual' income as a benchmark for the calculation." (*Id*. at pp. 1083-1084.)

We thus conclude the court did not abuse its discretion in rejecting Wesley's request to use a three month sample period. Wesley argues he should have been allowed to present evidence on limiting the income sample period to the three month period. The record shows he was given that opportunity at the October 29, 2018 child support hearing. Despite McMeekin arguing that Wesley's hours had been cut, as reflected in his recent paystubs, and even assuming Wesley had testified his hours were decreasing and would continue to do so, it was not unreasonable for the court to conclude that Wesley had not demonstrated that his hours and income would remain significantly reduced. We further conclude the manner in which the trial court conducted the child support hearing does not constitute reversible, prejudicial error. Wesley was given the opportunity to

24

present evidence and fully argue his case.  Furthermore, he forfeited any evidentiary or procedural objections by not raising them during the hearing.

IV.

VISITATION TIME SHARE

Wesley contends the trial court abused its discretion in assessing Wesley's child custody time share as zero for purposes of calculating child support.  Wesley argues his time share factor, commonly referred to as the "H" factor, should be the percentage of time stated in the stipulated judgment that he is permitted to spend with the children.[2]

A.  *Facts and Procedural Background*

During the child support hearing on October 29, 2018, McMeekin argued that the recommended guideline support was incorrect because it was based on Wesley having no physical custody or visitation with the children.  This was inconsistent with the stipulated marital dissolution judgment entered on October 5, 2018, which states Wesley is entitled to visitation one weekend per month, plus one month during summer break, and visitation during spring and winter breaks, in alternating years.  The court noted that the physical custody factor the court uses when calculating child support is based on the parents' actual time spent with the children, not the percentage of time stated in the judgment.

---

[2]  Wesley's appellant's opening brief states:  "The author estimates that the custodial time granted him in the [October 5, 2018, stipulated] Judgment is sixteen percent (16%), i.e., 57 of 365 days."

The court asked McMeekin how much time the parties were currently spending with the children. McMeekin responded that the October 5, 2018 judgment was dispositive. He noted that Deborah moved to Nevada with the children and, since then, it had been difficult for Wesley to visit the children. McMeekin added that this was why the October 5, 2018 judgment provides Wesley with summer visitation. The court asked Wesley when he had last visited the children. Wesley replied, "October 2016." The court responded that his time share for guideline support was therefore zero. In response, McMeekin explained that the October 5, 2018 stipulated judgment was entered based on what Wesley's prospective visitation would be. McMeekin argued that, therefore, his child support time share should be based on the visitation time stated in the stipulated judgment.

McMeekin noted that, before the judgment, Wesley had not seen the children for over a year because of Deborah's lack of cooperation. That changed when, at the time of the stipulated judgment, Deborah agreed to allow Wesley to visit the children during the summer.

Brunner, Deborah's attorney, responded that McMeekin was mischaracterizing the circumstances. Wesley's visitation provided in the October 5, 2018 judgment was not much different than what it had been before. Wesley simply had not visited the children. Even after entry of the October 5, 2018 judgment, Wesley made no attempt to visit the children.

26

B.  *Applicable Law on Determining Child Support Time Share Factor*

Section 4055 provides the following formula for calculating guideline child support:  "CS = K[HN - (H%)(TN)]."  (§ 4055, subd. (a).)  "'The court may depart from the guideline only in "special circumstances" set forth in the child support statutes. (§ 4052.)  "[W]hen ordering child support the trial court lacks discretion to vary from the presumptively correct amount, calculated by applying the algebraic formula in the statute, unless one or more of the statutorily enumerated rebuttal factors is found to exist." [Citation.]  . . .  [¶]  'There is a rebuttable presumption that the statewide uniform guideline formula amount is the correct amount of child support to be ordered.  (§ 4057.) The presumption can be rebutted by showing that application of the formula "would be unjust or inappropriate in the particular case . . . .'"'  (*In re Marriage of Katzberg* (2001) 88 Cal.App.4th 974, 980.)

The component of the uniform guideline formula pertinent to the instant case is the "H" factor, "which represents the 'approximate percentage of time that the high earner [here, father] has or will have *primary physical responsibility* for the children compared to the other parent.'  (§ 4055, subd. (b)(1)(D).)"  (*In re Marriage of Katzberg*, *supra*, 88 Cal.App.4th at p. 981, italics added.)  The determination of the percentage of "primary physical responsibility," aka "parenting time," to be imputed to each parent is one area in which a trial court retains some discretion.  (*Id*. at p. 977; *DaSilva v. DaSilva* (2004) 119 Cal.App.4th 1030, 1032-1033.)

C. *Analysis*

Wesley argues that the trial court erred in only considering Wesley's past time spent with the children and not considering the percentage of time permitted in the recent stipulated judgment. Wesley further asserts the trial court failed to inquire as to what his visitation in the future would be.

The record shows that, even though Wesley did not testify, his attorney, McMeekin, told the court that Deborah's move with the children to Nevada had made it difficult for Wesley to visit the children. The stipulated marital dissolution judgment, entered two weeks before the child support hearing, allows Wesley to spend a significant period of time with the children, including weekends once a month and during the summer and school breaks. Although the stipulated judgment allows Wesley to spend more than zero time with the children, the trial court did not abuse its discretion in using a zero time share for purposes of calculating child support because Wesley had a history of not visiting the children. At the time of the child support hearing, he had not seen the children for over two years, even though the previous custody and visitation orders provided him with visitation time. Wesley also acknowledged that he had not visited the children after entry of the recent judgment.

We recognize that the judgment was entered only two weeks before the child support hearing and, because Deborah lived with the children in Nevada, Wesley may not have been able to arrange for visitation during that post-judgment, two week period before the child support hearing. Nevertheless, based on Wesley's history of not visiting

28

the children for over two years, thus demonstrating he had not exercised any "primary physical responsibility" over the children for over two years, it was not unreasonable for the court to calculate child support based on a zero H factor for Wesley.

## V.

## DISPOSITION

The child support order is affirmed. Deborah and CSS shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

FIELDS
J.

MENETREZ
J.

29